IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 1, 2019 Session

## STATE OF TENNESSEE v. EDDIE SMITH

**Appeal from the Criminal Court for Shelby County**
No. 16-01067      James M. Lammey, Judge
_____

### No. W2018-01509-CCA-R3-CD
_____

Defendant, Eddie Smith, appeals his conviction for second degree murder and his twenty-one-year sentence. On appeal, Defendant contends that the trial court erred in (1) excluding proof of the victim's prior bad acts as corroborative evidence that the victim was the initial aggressor and (2) instructing the jury that Defendant had a duty to retreat before using force intended or likely to cause death or serious bodily injury in self-defense. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Michael R. Working and Jennifer L. Dilley (on appeal), Memphis, Tennessee; Phyllis Aluko, Shelby County Chief Public Defender, and Glover Wright and Benjamin Baker, Assistant Public Defenders (at trial), for the appellant, Eddie Smith.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stephanie Johnson and Ryan Thompson, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

*Background*

The evidence presented at trial established that on September 14, 2015, Defendant shot the unarmed victim, Jermaine Aldridge, twice during an argument and killed him. The victim was the boyfriend of Jovan Townsend, Defendant's former girlfriend.

Defendant maintained that the victim had threatened him, that Defendant believed the victim was reaching for a gun when Defendant shot the victim, and that Defendant shot the victim in self-defense.

Prior to trial, the defense filed a motion seeking to introduce evidence of the victim's prior acts of violence as corroborative evidence of Defendant's claim that the victim was the first aggressor. Specifically, Defendant sought to present the victim's February 2008 conviction for aggravated robbery, February 2013 convictions for aggravated burglary, domestic assault, two counts of assault, and vandalism, and August 2015 conviction for domestic assault of Ms. Townsend. While Defendant referred to the August 2015 incident as a conviction, none of the attachments to Defendant's motion or exhibits marked for identification at trial include a disposition. Defendant states in his brief that the August 2015 incident resulted in a charge and had not yet been disposed of prior to the victim's death. When the motion was discussed on the day of trial, the trial court noted that it must determine whether self-defense had been fairly raised by the proof before it allowed the defense to present the requested evidence, and defense counsel agreed that he would request a jury-out hearing before seeking to introduce such evidence.

### State's Proof

At trial, Ms. Townsend testified that she and the victim had been in a relationship for about three months prior to his death. She dated Defendant before she dated the victim, and she and Defendant ended their relationship approximately one month before she began dating the victim. Ms. Townsend stated that the victim believed she continued to have feelings for Defendant and would "get on [her] case" about her being around Defendant. While Ms. Townsend was running errands on the day of the shooting, the victim was "blowing [her] phone up" because he believed she was with Defendant, who lived in the same apartment complex as Ms. Townsend. She maintained that she was "forced to date" the victim and that she told this to police officers. She believed she and the victim were not in a real relationship, and she maintained that she was "scared for [her] life."

The victim came to Ms. Townsend's apartment on the evening of the shooting, and she, the victim, and her children walked to a store. While in the store, Ms. Townsend's son asked her if they could go somewhere together while the victim watched her three daughters, and Ms. Townsend responded, "You think I can leave my children with this man?" The victim became angry. Ms. Townsend and the victim returned to her apartment and remained outside and talked. Ms. Townsend testified that when the victim asked her why she did not trust him with her children, she wanted to tell him the truth but instead told him that she trusted him. The victim told her that he planned to get

something to eat and go home. Ms. Townsend hugged the victim and entered her apartment.

When Ms. Townsend began to eat her dinner shortly thereafter, she heard the victim singing outside. The victim called out Ms. Townsend's name and told her to come outside. When she went outside, she saw the victim standing in the parking lot and singing. She did not see anyone else out there at the time. The victim hugged Ms. Townsend, grabbed her buttocks, turned his head, and smiled. Ms. Townsend looked in the direction where the victim was smiling and saw a group of people that included Defendant standing in an area "pretty far" from the victim and Ms. Townsend.

Ms. Townsend stated that the victim began calling out Defendant's name and saying that he wanted to fight Defendant. Ms. Townsend grabbed the victim and tried to pull him away, but the victim "snatched away" from her. Defendant and the other members of his group walked toward the victim and Ms. Townsend, and Ms. Townsend turned to walk away. The victim took off his shirt and gave it and his cell phone to Ms. Townsend. Ms. Townsend testified that the victim was "provoking [Defendant] to fight." Defendant asked the victim, "Why do you keep [expletive] with me, man?" The victim replied by calling Defendant an "[expletive and racial slur] man." Defendant said, "I gave you your [expletive], you got what you wanted, so why [are] you still [expletive] with me, man." The victim continued to curse at Defendant and call him names.

Ms. Townsend turned away from the argument and began walking toward her sister's apartment. She heard the victim say, "You ain't gonna shoot nothin', man," followed by two gunshots. Ms. Townsend, who was ten to fifteen feet away from the victim, turned around and saw the victim standing "catty-corner" so that he was facing both Ms. Townsend and the group that was between her and the victim. Ms. Townsend did not notice whether someone had been shot. The victim was looking at her when she heard a third gunshot. The victim fell to the ground, and Ms. Townsend tried to save him by wrapping his shirt around the wound on his head. Ms. Townsend acknowledged that prior to the shooting, she was walking away from the victim and Defendant and was trying to convince the victim to come with her. She denied that the victim was starting to come with her when the initial two gunshots were fired. She denied telling the police that after the two gunshots, the victim was trying to walk away when Defendant shot him again.

After the victim fell to the ground, Defendant stood for two or three minutes until one of the men in the group grabbed his hand to leave. Ms. Townsend stated that Defendant did not run and appeared to be in shock. Ms. Townsend gave a statement at the scene and at the police department and identified Defendant in a photograph as the shooter.

Ms. Townsend maintained that her statement to the police was not accurate because it was not "told from the beginning" and that law enforcement only questioned her about the shooting. She stated that her statement to the police officers that the victim appeared as if he was trying to walk away when he was shot and her testimony at trial were both true. She explained that the victim "was literally not walking. He w[as] still . . . standin' in one spot looking like he was walking, but he still was just standin' there." Ms. Townsend never saw the victim with a weapon. She denied telling the police that she initially did not see Defendant with a gun but that when she turned around, she saw him shoot the final shot with a silver gun. She recalled that the victim told Defendant, "You ain't nothin' but a little [expletive]," before the shots began.

Ms. Townsend acknowledged that she did not want to testify at trial. At the time of trial, she was living in Stockton, California, the same city where Defendant lived. She denied being in a relationship with Defendant and stated that she moved there for the safety of herself and her children. She maintained that she moved there in order to "stop looking behind [her] back because every time [she] was . . . in Memphis, [she] saw [the victim's] family." She denied speaking to Defendant, his family members, or his friends after the shooting and prior to the December 2015 preliminary hearing. She spoke to Defendant sometime after the preliminary hearing and visited him in California in April 2016. She explained that Defendant asked her to visit him in California for two weeks and that she did so "to get out from hiding—from looking behind my back wondering if I'm gonna get messed up after everything that . . . happened." Ms. Townsend subsequently returned to Memphis but decided to move with her children to California permanently. She stated that she was living in a shelter and had not seen Defendant in approximately two months. She stated that she last spoke to Defendant four days prior to her testimony and to Defendant's father one day prior to her testimony, but she denied discussing the case with them.

On cross-examination, Ms. Townsend testified that on the day of the shooting, she did not want to be with the victim due to an incident that occurred at the store earlier in the evening and due to "the situation [that] happened . . . prior [to] that day." She maintained that she and Defendant did not associate with each other once she began her relationship with the victim.

During a bench conference, defense counsel announced his intention of eliciting testimony from Ms. Townsend regarding her relationship with the victim and the relationship between the victim and Defendant prior to the day of shooting to support the defense's theory that the victim was the first aggressor. The State objected on the basis of relevancy. The trial court stated that self-defense had not yet been raised by the proof

and that defense counsel may have to recall Ms. Townsend as a witness once self-defense was raised by the proof.

On continued cross-examination, Ms. Townsend testified that she first saw Defendant when she, the victim, and her children were returning from the store. She and Defendant did not talk to each other. She stated that when she heard the victim singing outside her apartment, she went outside to see him because she "felt like [she] had no other choice." When Ms. Townsend approached the victim, he stopped singing and began calling out to Defendant. She believed that the victim was trying to get a reaction from Defendant when the victim grabbed her buttocks and looked in Defendant's direction. Based on the victim's statements, Ms. Townsend also believed that he wanted to fight Defendant. She agreed that the victim began walking in Defendant's direction, that she grabbed the victim to try to get him to walk away, that the victim pulled away from her and continued walking toward Defendant, and that she called for the victim to come back. Defendant also approached, and he and the victim argued while about ten feet away from each other. Ms. Townsend agreed that she heard the victim threaten Defendant. When defense counsel asked what those threats were, the State objected.

The trial court held a hearing outside the jury's presence during which Ms. Townsend testified that she heard the victim threaten Defendant, stating that he wanted to fight Defendant and by walking "back and forth up to him." She did not hear the victim threaten to kill Defendant or say anything about Defendant's daughter prior to the shooting. Ms. Townsend testified that she heard the victim threaten to kill Defendant a few days before the shooting while the victim was talking to her mother. Ms. Townsend was unaware of any prior physical altercations between Defendant and the victim.

Ms. Townsend agreed that the victim abused her often both physically and emotionally during their three-month relationship. She also agreed that Defendant was aware of some of the incidents of abuse because she would occasionally go to Defendant for protection when the abuse first began. Defendant was present the first time that Ms. Townsend called the police after the victim had abused her. Ms. Townsend testified that in mid-August of 2015, the victim pointed a gun at her and went to jail as a result. The victim told her that if he went to jail, he could be released and that "he's comin' right next to [her]." While in jail, the victim called Ms. Townsend and instructed her to not go to court for his hearing. She recalled an occasion when the victim became angry because she did not want to have sex with him and she ran to her daughter's school to escape him. The victim caught her, punched her, and stabbed her in her stomach with a lead pencil. Ms. Townsend punched the victim and ran inside the school with her daughter, and the victim came inside to get her. Ms. Townsend recalled one occasion when the victim grabbed her and she hit her head, and she recalled another occasion when the victim put

out a cigarette on her skin. On another occasion, after punching Ms. Townsend, the victim threatened to hit her son, who was nine or ten years old at the time.

The trial court found that the victim's statements and threats made at the time of the shooting were relevant and admissible. The trial court held that the victim's prior threats against Defendant and the victim's prior acts of abuse against Ms. Townsend were not admissible because the issue of self-defense had not yet been fairly raised by the proof and that the defense could recall Ms. Townsend to testify once self-defense had been fairly raised.

On continued cross-examination in front of the jury, Ms. Townsend testified that she heard the victim cursing at Defendant and calling him names as if the victim wanted to fight. She recalled hearing Defendant say, "I don't want to fight you," and "I don't want to shoot you." She agreed that Defendant wanted to be left alone. Prior to the shooting, the victim threw his shirt and cell phone to Ms. Townsend and told her to call his brother. Ms. Townsend stated that she heard gunshots but did not see a gun. She was not looking at the victim when she heard the first two gunshots but was walking in the opposite direction. She turned around and saw the victim standing sideways, heard a third gunshot, and saw a flash after which the victim fell.

Memphis Police Officer Tristan Brown of the crime scene division responded to the scene and identified three spent forty-caliber shell casings that were recovered. Investigators with the felony response unit also responded to the scene where they took a statement from Ms. Townsend. Sergeant James K. Smith of the homicide bureau was assigned the case the following day and contacted Defendant to request an interview. Defendant agreed to an interview and came to the homicide office where he was placed in an interview room. Defendant was advised of his rights, which he waived, and he agreed to speak to the officers. Sergeant Smith testified that Defendant did not appear to be under the influence of alcohol or drugs, that Defendant was cooperative, and that after the officers interviewed him, he agreed to provide a written statement.

Defendant acknowledged in his written statement that he was responsible for the victim's death. Defendant stated that he knew the victim through Ms. Townsend, Defendant's ex-girlfriend, and that although he and Ms. Townsend had broken up in March, they continued to "talk[] on and off." He learned that Ms. Townsend and the victim were in a relationship in April when he saw them "hugged up" together at an apartment complex. Defendant stated that he last spoke to Ms. Townsend approximately one week prior to his statement when Ms. Townsend told him that the victim had "lost his mind" and that she no longer wanted to be involved with the victim.

Defendant stated that in the three days prior to the shooting, the victim had been threatening him and "popping up on" him while Defendant was walking his daughter to school. When asked to explain the threats, Defendant said, "Cussing me out and saying what he was gonna do to me—this and that. I know he is an Enforcer for the GD Gang." Defendant did not call the police but tried to avoid the victim. He denied that the victim ever became physical with him and said the victim only verbally threatened him.

Defendant stated that on the day of the shooting, he went to a liquor store with acquaintances he identified as Tommy Lee, Calvin or "Chicago," Vic, Cedric, Stephanie and Nita. When they returned to the apartment complex, they saw the victim standing outside near Ms. Townsend's apartment. The victim began calling Defendant "all types of [expletive] and stuff," and Defendant approached "trying to see what he was talking about." The victim turned his back on Defendant and began taking off his shirt. Defendant stated that when the victim began to turn around, Defendant did not know whether the victim had a weapon, so Defendant pulled out his gun and shot the victim three times. When asked whether he could see the victim's hands on his shirt as the victim was removing his shirt, Defendant replied, "Yes. As he was taking his shirt off, he moved like he was trying to rush me, so I just upped my gun." Defendant acknowledged that he did not see the victim with a weapon. Defendant maintained that the victim threatened him before Defendant shot him, stating that the victim "was acting like he wanted to fight me, but I didn't know if . . . he was armed or not." Defendant denied that he fired two shots, paused, and then fired one more shot.

Defendant "went into shock" and fled the scene, throwing his gun into the woods. He called Louis Caston, who picked him up and drove him to his aunt's home in Collierville. Defendant explained that he did not notify the police about the shooting because he was afraid. He said he shot the victim with a forty-caliber gun that Defendant had purchased from a friend for protection two weeks earlier. Defendant concluded his statement by maintaining that he shot the victim in self-defense, and he signed the statement and initialed each page.

On cross-examination, Sergeant Smith testified that after taking Defendant's written statement, he contacted the Shelby County District Attorney General's Office and reviewed the information with a prosecutor. Defendant was then released. Sergeant Smith recognized that "GD" meant "Gangster Disciple," but he did not research whether the victim or Defendant had any gang affiliations because he did not believe that the shooting was gang-related.

Memphis Police Sergeant Eric Kelly with the homicide bureau testified that after several witnesses were interviewed, officers determined that Defendant should be interviewed again because the information provided by Defendant in his initial statement

was not accurate according to the information obtained from these witnesses. Approximately two weeks after the shooting, Defendant was contacted, and his father drove him to the homicide office. Defendant waived his rights and agreed to be interviewed. The officers informed Defendant that his initial statement was not consistent with the information provided by witnesses to the shooting, and Defendant admitted that he had not told the officers everything that had occurred on the night of the shooting.

During the interview, Defendant agreed to provide a second written statement, which he then initialed on each page and signed at the bottom. He again acknowledged that he was responsible for the victim's death and admitted that his prior statement was not a complete and truthful statement because he had "left out pieces." Defendant stated that while returning from the liquor store with Tommy Lee, "Chicago," "Vetta," Cedric, and "Ms. Nita," he was confronted by the victim, and they began arguing. Defendant said the victim "call[ed] me out by name," called him an "[expletive and racial slur]," and said he was going to shoot Defendant and Defendant's daughter. Defendant stated he "went into a rage" and yelled out, "Somebody gonna die tonight." He ran to his apartment where he retrieved his gun and returned to where the victim was standing. Defendant said his intention in retrieving his gun and returning to the victim was to shoot the victim but not to kill him. Defendant maintained, "I was in a rage. He made threats to kill me and my daughter."

The victim continued to harass Defendant, cursing him and stating that Defendant "wasn't gonna do anything." Defendant believed the victim saw his gun, which was tucked into his jeans and on his hip, because the victim said, "What [are] you gonna do? . . . [F]ight me or shoot me?" The victim then said, "[expletive and racial slur], I turn my back on you," and turned his back to Defendant. Defendant stated that when the victim turned back toward him, the victim was removing his shirt and asked, "Are you gonna fight me or are you gonna shoot me?" Defendant replied that he was not going to fight the victim, and the victim stated, "You're not gonna do [expletive]—not a [expletives] thing." Defendant stated that he was "in a rage" and fired his gun three times. He was unsure how many times he struck the victim or where he struck him. Defendant estimated that he was ten to fifteen feet away from the victim when he fired his gun and maintained that he did not aim the gun before shooting.

Defendant stated that he was "in shock" following the shooting and fled. He gave his gun to a man named Courtney and instructed Courtney to hold the gun for him. Defendant fled the apartment complex and called Louis Caston, who drove him to meet his cousin. Defendant's cousin then drove him to his aunt's house. Defendant stated that he purchased the forty-caliber gun with which he shot the victim from a friend named "Blue." Defendant asked Mr. Caston to get the gun back from Courtney, but Mr. Caston

said Courtney no longer had the gun. Defendant said that while he had been drinking earlier in the day of the shooting, he had not had any alcohol since 4:00 p.m. He described himself as "buzzed but not drunk" at the time of the shooting. Once Defendant signed his statement, he was arrested.

Dr. Paul Benson, a forensic pathologist, performed the autopsy of the victim and testified that the victim sustained two gunshot wounds, one to the left side of his chest and one to the left side of the back of his head. One bullet entered the left side of the victim's chest near his armpit, exited, reentered into the armpit, and exited from the back of the armpit. The bullet only traveled through soft tissue underneath the skin and did not strike any major blood vessels or arteries. The other bullet entered the left side of the back of the victim's head, traveled through the bone and the left side of the brain, rendering the victim immediately unconscious. One part of the bullet fragment exited the left side of his head, while most of the bullet remained inside his head. Dr. Benson determined that the cause of the victim's death was the gunshot wound to the head, which would have caused immediate death.

Dr. Benson saw no evidence, such as gunpowder stippling, that would indicate that the firearm was discharged from a close range. He determined that the firearm was discharged from an indeterminate range, which he stated likely meant from a distance of more than twelve to twenty-four inches. On cross-examination, Dr. Benson testified that the entrance wound to the head was located at the back of the head behind the left ear.

### Defense Proof

Tommy Lee was with Defendant at the time of the shooting. Mr. Lee testified that at approximately 4:00 p.m. or 5:00 p.m. on the day of the shooting, he went to "Ms. Nita's" apartment where a group of people had gathered. The group decided to walk to a convenience store and a liquor store located about a quarter of a mile away. Mr. Lee was walking with Defendant, "Chicago," and "Allen" back to the apartment complex when Mr. Lee heard the victim rapping. The victim was laughing and saying, "Yes, somebody gonna get it tonight—somebody gonna die tonight—everybody, somebody gonna die tonight." Mr. Lee asked Defendant who the "fool" rapping was, and Defendant stated that the victim was not rapping but was talking about Defendant.

Mr. Lee testified that as they were walking toward "Ms. Nita's" apartment, the victim walked through the "cut" and met them on the other side. The victim and Defendant argued for approximately twenty minutes. Defendant told the victim to leave him alone, and the victim replied, "Man, are you mad because I came to your neighborhood and took your [girlfriend]?" Defendant replied, "I don't care nothin' about that, man." Defendant told the victim that he did not want to fight or shoot the victim and

- 9 -

that he wanted the victim to just leave him alone. At some point, Defendant walked away. When Mr. Lee asked "Chicago" where Defendant was going, "Chicago" told him that Defendant was going to get a gun and that the victim had stated that he was going to kill Defendant in front of Defendant's daughter.

When Defendant returned, Mr. Lee asked him for the gun, and Defendant ignored him. Mr. Lee then told him to give the gun to "Chicago," but Defendant also ignored that instruction. Defendant and the victim began arguing. The victim called Defendant names and said Defendant was not going to do anything. Mr. Lee testified that during the exchange, the victim was continuously reaching into his pants as if he had something hidden in them. Mr. Lee stated that the last time that he saw the victim reach into his pants, it appeared as if the victim dropped whatever was in his pants. Mr. Lee said that as the victim was coming up, Mr. Lee turned to speak to "Chicago" and heard "pow." Mr. Lee testified that he expected to see Defendant lying on the ground with a gunshot wound due to the victim's behavior in calling Defendant names, arguing with him, and reaching into his pants. Mr. Lee acknowledged that he did not see the victim with a gun.

Mr. Lee also testified that after Defendant said he did not want to fight, the victim removed his shirt and took his cell phone out of his back pocket. Mr. Lee saw the victim reach into his pants before removing his shirt. The victim then turned around to give his shirt to Ms. Townsend. Mr. Lee stated, "The last time, he took his shirt off, and he put his hands off in his pants. When he turned back round, that's when I . . . was tellin' Chicago to tell [Defendant] to come . . . on." Following the shooting, Mr. Lee went to his apartment. He said he then returned to the scene and saw that the victim's body had been moved.

On cross-examination, Mr. Lee testified that he did not believe that Ms. Townsend was present when the victim was shot and that she came outside once she heard the gunshot. Mr. Lee acknowledged that he gave a statement to the police a few days after the shooting and a second statement days later. He maintained that he told the truth in both statements, but he did not recall what he said in the statements. He also maintained that the police coerced him into stating that Defendant had a gun in his second statement by threatening to put him in jail since he was a convicted felon. He denied telling the police that he and others got together and agreed to provide similar accounts to the officers. When the State showed Mr. Lee his statements in an effort to impeach him, Mr. Lee stated that he could not read, and Mr. Lee maintained on redirect examination that he told the officers who took his statement that he was unable to read.

During a jury-out hearing, the trial court announced that it would instruct the jury on self-defense even though it was not yet satisfied that self-defense had been raised. The parties and the trial court also discussed whether Defendant was acting unlawfully

such that the trial court would instruct the jury that he had a duty to retreat. The trial court stated that pursuant to Tennessee Code Annotated section 39-17-1307, it is a Class A misdemeanor to carry a handgun in a place open to the public where one or more persons are present. The trial court found that when Defendant retrieved the handgun, he was armed in violation of this statute and was acting unlawfully, and as a result, the trial court included in the jury instructions that Defendant had a duty to retreat.

Defendant testified that he moved from Memphis to Stockton, California, in February 2017 for the safety of himself and his eleven-year-old daughter. Ms. Townsend moved to Stockton in April or May of 2017. Defendant denied that he paid for her to move and stated that they only contacted each other occasionally to check on their respective children. Defendant and Ms. Townsend were in a relationship from 2013 until March of 2015. After their relationship ended, they continued to speak to each other on occasion. Defendant knew the victim through Ms. Townsend and spoke to her about the victim on multiple occasions, including an occasion approximately one week prior to the shooting during which Ms. Townsend was distraught when discussing the victim. Defendant stated that on several occasions, including the week prior to the shooting, the victim would appear and threaten him while Defendant was taking his daughter to school. The threats frightened Defendant because he did not know what the victim was capable of doing. Defendant tried to avoid the victim by taking different routes or having friends drive him and his daughter.

Defendant testified that on the day of the shooting, he and others went to "Ms. Nita's" apartment where they grilled and drank alcohol. At around 7:00 p.m., the group walked to a liquor store and returned to the apartment complex fifteen to twenty minutes later. Defendant said that when he reentered the apartment complex with "Lavette," "Ms. Nita," "Stephanie," "Chicago," "Allen," and Mr. Lee, he saw the victim outside in front of Ms. Townsend's apartment. The victim was repeating, "Somebody's gonna die tonight, somebody's gonna die tonight," while looking at Defendant. Mr. Lee asked Defendant if he knew who the subject of the victim's statement was, and Defendant stated that the victim was talking about Defendant. Defendant testified that the victim was "running off at the mouth callin' me out my name." Defendant and the others in the group were walking back to "Ms. Nita's" apartment and went in another direction in order to avoid the victim. However, the victim came through "the cut" and met them on the other side.

Defendant testified that while he tried not to talk to the victim, the victim was steadily talking "mess" to him, "calling me out my name," was calling Defendant an "[expletives and racial slur]", and saying that Defendant was mad "because I came over here and took your girl from your hood." Defendant asked the victim why he was harassing him, and the victim cursed and threatened Defendant. Defendant stated that the

- 11 -

victim said that the next time he saw Defendant, he was going to kill Defendant and Defendant's daughter. Defendant became upset and went to his apartment to retrieve his gun. He explained that he believed that the victim was going to harm him and that he did not know what the victim was capable of doing. Defendant maintained that he had no intention of using the gun but that he only retrieved it to protect himself.

Defendant stated that he returned to the area, intending to go to "Ms. Nita's" apartment with the group. However, upon his return, the victim approached him and began harassing him again. Defendant noticed that Ms. Townsend was outside too. The victim and Defendant argued for approximately fifteen minutes, and Defendant said he told the victim to leave him alone. The victim stated, "Next time I see you and your daughter, I'm gonna kill you." When the victim asked if Defendant wanted to fight, Defendant replied that he did not want to fight or shoot the victim and just wanted the victim to leave him alone. The victim called Defendant an "[expletive and racial slur]" and said, "You're not going to shoot [expletive]."

Defendant testified that the victim removed his shirt, turned his back on Defendant, and gave his shirt and cell phone to Ms. Townsend. Defendant said that the victim appeared to reach for something in his waistband and that the item fell between his legs. The victim appeared to attempt to "readjust" himself, turned his back on Defendant, and said, "I'm gonna turn my back on you again, [expletive and racial slur]." Defendant testified that the victim's hand was at his waistband and that as the victim was coming up and turning, Defendant pulled out his gun and shot three times. Defendant maintained that he shot the victim because he believed the victim was going to shoot him, and Defendant believed it was necessary to shoot to protect himself. Defendant did not know why he shot his gun three times and said that he fired the shots all in a row and did not aim before firing.

Defendant testified that he "went into shock" following the shooting and stood at the scene for about two minutes until Mr. Lee and "Chicago" reached out to him. Defendant then ran through the apartment complex and laid his gun on the steps where a man named Courtney was standing. Defendant ran out of the apartment complex and called Mr. Caston, who drove him to meet his cousin. Defendant's cousin drove him to his aunt's house for the night. Defendant turned himself in to the police the next morning after Sergeant Smith contacted him. Defendant stated that he told the officers everything that occurred. When asked why his written statement did not include the information about his retrieving his gun, Defendant responded that the officers must have failed to include it in their report. Defendant said that during the second interview, he provided the officers with the same information but that after Sergeant Kelly accused him of lying, Defendant told the officer what the officer wanted to hear.

- 12 -

On cross-examination, Defendant testified that on one occasion, Ms. Townsend came to his apartment and told him that the victim had beaten her. Defendant agreed that the victim was stalking him. He also agreed that when he first spoke to the police, he did not tell the officers about retrieving the gun from his apartment. He acknowledged that after the shooting, he sent a text message to Mr. Caston to go get his gun and to keep it until "I get clear on this—I'm gonna get off this."

### *Jury-Out Hearing Regarding First Aggressor Evidence and Duty to Retreat Instruction*

Following Defendant's testimony, the trial court held a hearing outside the presence of the jury regarding Defendant's motion to introduce evidence of the victim's prior acts of violence. Defense counsel stated that he was seeking to introduce the victim's prior convictions or charges for domestic assault in August 2015, aggravated robbery in February 2008, and aggravated burglary and vandalism in February 2015. Defense counsel argued that the convictions were admissible not as substantive evidence but to corroborate the defense theory that the victim was the first aggressor. Defense counsel also argued that the admissibility of the convictions was governed by Rules 401 and 403 of the Tennessee Rules of Evidence, rather than Rule 404.

The trial court questioned whether the issue of first aggressor had been raised by the proof. The trial court noted that there was only a "mere allegation" that the victim "made a gun play," that no one saw the victim with a gun, and that the victim only threatened to kill Defendant and his daughter the next time that he saw them, which meant that the threat was not imminent. In analyzing the issue of first aggressor, the trial court also stated that Defendant had a duty to retreat and that because self-defense is an affirmative defense, "[i]f he had a license to carry a weapon, it should have been shown that he had a license to carry a weapon. It wasn't shown."

Defense counsel argued that no proof was presented that Defendant's possession of the gun was unlawful and that, regardless, under the applicable statute, this type of potentially unlawful activity can be lawful if there is justifiable self-defense. Defense counsel further argued that the proof, when viewed in a light most favorable to Defendant, raised a claim of self-defense, that any issues of conflicting evidence should be resolved by the jury as the finder of fact, and that the jury could consider the victim's prior violent convictions as corroborative evidence of Defendant's claim that the victim was the first aggressor. The State responded that evidence of a conviction alone is not evidence of first aggression and that the trial court must consider the underlying facts of the conviction to determine whether the conviction involved violence. Defense counsel responded that he was not seeking to present the underlying facts of the convictions at trial. When questioned by the trial court about what proof the defense had regarding the underlying facts of the victim's prior convictions, defense counsel responded that he had

the affidavits of complaint and the certified copies of the judgments and that Ms. Townsend could testify as to the victim's domestic assault charge in August 2015.

The trial court found that the issue of first aggressor had not been reasonably raised by the proof and noted that the evidence established that the victim was "gunned down because he's dissing somebody." The trial court also questioned whether the issue of self-defense was reasonably raised but stated that it was instructing the jury on self-defense. The trial court noted that no one saw the victim with a gun and that Defendant was not in imminent danger because the victim threatened to kill Defendant the next time that he saw Defendant. With regard to the admissibility of the victim's prior convictions, the trial court stated, "I think it's grossly unfair to the victim in this case with no proof that he was the first aggressor. Nevertheless, to let in proof of his bad character for violence where there's no proof that he was a first aggressor." The trial court found that the admission of the victim's prior convictions was "way too prejudicial. It's way too unfair to [the victim]. He's not here to defend himself. He's deceased." The trial court concluded that "the probative value is substantially outweighed by the potential for unfair prejudice" and did not allow the defense to admit the victim's prior convictions.

The trial court then addressed whether the jury should be instructed that Defendant had a duty to retreat. Defense counsel argued that in determining whether a person is engaged in unlawful activity which then requires a duty to retreat, the self-defense statute includes an exception when the person possesses, displays, or employs a handgun in justifiable self-defense. The trial court stated that when Defendant retrieved his gun and left his apartment, "from the time he leaves the apartment until the time he arrives and provokes the fight with the victim, he's breaking the law."

The trial court concluded that "unless I see proof that [Defendant] had a license to carry [the gun], then he was breaking the law at the time; and, therefore, he had a duty to retreat." Defense counsel argued that the defense did not have a duty to show that Defendant was not engaged in unlawful activity but that it was the State's burden to establish that Defendant was engaged in unlawful activity such that he had a duty to retreat. The trial court stated that whether Defendant was engaged in unlawful activity was a determination by the court "so I've determined that he didn't have a license, and once he left the apartment with the intent to go shoot someone, he was breaking the law."

The prosecution offered to present the testimony of an agent who "ran" Defendant's driver's license to testify that a handgun carry permit was not issued to him. During the jury-out hearing, Connie Justice, a criminal investigator with the Shelby County District Attorney General's Office, testified that on the morning prior to her testimony, she was asked to research Defendant's driver's license history. Defense counsel objected, arguing that Ms. Justice was not qualified as the keeper of any records

and that her testimony was based upon documentation that was hearsay and was in violation of Defendant's confrontation rights. The trial court overruled the defense's objection. Ms. Justice testified that a person's license information also includes information as to whether the person has a handgun permit. No handgun permit, either current or expired, was listed in Defendant's records. Defendant did not have a Tennessee driver's license and only had a temporary identification that expired in March 2018.

On cross-examination, Ms. Justice testified that the documentation of Defendant's license information was not a certified copy and that she was not a keeper of the records of the Tennessee Department of Safety. She was unaware that Defendant was a California resident and whether he had a license or permit to carry a weapon from any other jurisdiction. At the conclusion of the testimony, the trial court announced that it would instruct the jury that Defendant had a duty to retreat.

### State's Rebuttal Proof

Memphis Police Lieutenant Marlon Wright testified that in September 2015, he took Mr. Lee's written statement regarding the shooting. Lieutenant Wright asked Mr. Lee whose idea it was to lie to the investigators about what had occurred, and Mr. Lee replied that "we all got together and added pieces to the story trying to tell the truth without lying." Mr. Lee stated that when someone told them that they could go to jail if they told the investigators what they witnessed, they "all agreed to say some of the same stuff." When Mr. Lee completed his statement, Lieutenant Wright asked him if he could read and write, and Mr. Lee stated that he was unable to read. Lieutenant Wright then read the statement back to Mr. Lee, who signed the statement and initialed each page.

At the conclusion of the proof, the trial court read the instructions to the jury. While the instructions were not transcribed, the written instructions provide that in instructing the jury on self-defense, the trial court also instructed the jury:

> The law of self-defense requires that the defendant must have employed all means reasonably in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life. This requirement includes the duty to retreat, if, and to the extent, that it can be done in safety.

The jury subsequently convicted Defendant of second degree murder, and following a sentencing hearing, the trial court imposed a twenty-one-year sentence. Defendant filed a motion for new trial and an amended motion, which were denied by the trial court. Defendant then filed a timely notice of appeal to this court.

*Analysis*

## I. Exclusion of Evidence of the Victim's Prior Bad Acts

Defendant contends that the trial court erred in excluding evidence of prior bad acts of the victim that Defendant sought to introduce to corroborate his claim that the victim was the initial aggressor. Defendant does not challenge the trial court's exclusion of Ms. Townsend's testimony regarding the victim's acts of abuse against her or his threats against Defendant. Rather, Defendant challenges the trial court's exclusion of "self-authenticating court documents" establishing that the victim had prior convictions for aggravated robbery, aggravated burglary, and vandalism and that he had been charged with domestic assault against Ms. Townsend approximately one month prior to the shooting. The State responds that the trial court did not abuse its discretion in excluding the evidence and that any error was harmless.

A trial court has broad discretion regarding its decisions on the admissibility of evidence, and this court reviews those decisions under an abuse of discretion standard. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008); *State v. Looper*, 118 S.W.3d 386, 422-23 (Tenn. Crim. App. 2003) (citing *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002)). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on "a clearly erroneous assessment of the evidence," or employs "reasoning that causes an injustice to the complaining party." *Banks*, 271 S.W.3d at 116.

Generally, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). When a defendant relies on a theory of self-defense and that the alleged victim of a violence crime was the first aggressor, the defense may present evidence of the victim's prior history of violent conduct. *State v. Ruane*, 912 S.W.2d 766, 781-82 (Tenn. Crim. App. 1995), *abrogated on other grounds by State v. Rogers*, 992 S.W.2d 393, 401 (Tenn. 1999). "There is a distinction between evidence of prior acts of violence by the victim used to corroborate the defense theory that the victim was the first aggressor and that used to establish the defendant's fear of the victim." *Id.* at 779. When the defendant's fear of the victim is relevant and the defendant is aware of the prior acts, the defendant may testify concerning his knowledge of the victim's violent conduct. *State v. Hill*, 885 S.W.2d 357, 361 n.1 (Tenn. Crim. App. 1994) (citing *Williams v. State*, 565 S.W.2d 503, 505 (Tenn. 1978)); *see State v. Samuel Sherrill*, No. M2009-01979-CCA-R3-CD, 2011 WL 1564009, at *7 (Tenn. Crim. App. Apr. 21, 2011). Such evidence constitutes substantive evidence of the defendant's subjective state of mind. *See L.B. Rittenberry, Jr., v. State*, No. M2016-00409-CCA-R3-PC, 2017 WL

1278677, at *5 n.4 (Tenn. Crim. App. Apr. 5, 2017); *State v. Chancy Jones*, No. W2010-02424-CCA-R3-CD, 2012 WL 1143583, at *7 n.6 (Tenn. Crim. App. Apr. 5, 2012). However, "[t]he defendant need not be aware of the victim's prior violent acts at the time of the alleged self-defense in order to use the evidence for the limited purpose of corroborating the defendant's self-defense claim." *Chancy Jones*, 2012 WL 1143583, at *7 (citing *Ruane*, 912 S.W.2d at 781-782). Such evidence is only admissible as corroborative evidence and not substantive proof, and, thus, the admission of the evidence is not governed by Tennessee Rules of Evidence 404(a)(2) and 405. *See id.*; *Ruane*, 912 S.W.2d at 781-82; *see also* Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.04[5][d] (6th ed. 2011) (stating that the use of the victim's prior acts to corroborate the defendant's claim that the victim was the first aggressor "is not covered by Rule 404(a)(2), which deals with substantive rather than corroborative proof" and that as a result, "Rule 405(a) and (b) also do not appear to apply").

Defendant does not claim that the victim's prior criminal history was admissible as substantive evidence of Defendant's state of mind. Rather, Defendant maintains that such evidence was admissible to corroborate evidence that the victim was the initial aggressor. Based on *Ruane*, this court has recognized three prerequisites to the introduction of corroborative evidence of the victim's first aggressor tendencies: (1) the issue of self-defense must be raised by the proof and not simply by statements of counsel; (2) there must be a factual basis underlying the defendant's claim that the victim had first aggressor tendencies; and (3) the trial court must determine whether the probative value of the evidence is outweighed by the danger of unfair prejudice. *Ruane*, 912 S.W.2d at 781 (citing *State v. Laterral Jolly*, No. 02C01-9207-CR-00169, 1993 WL 523590, at *4 (Tenn. Crim. App. Dec. 15, 1993)); *see State v. Wayne Robert Wait*, No. E2010-01212-CCA-R3-CD, 2011 WL 5137178, at *12 (Tenn. Crim. App. Oct. 28, 2011).

The trial court instructed the jury on self-defense, and the State concedes that some proof was presented that warranted such an instruction. However, the State contends that the trial court correctly found that there was no evidence that the victim was the first aggressor in the shooting and accordingly no basis to admit corroborating evidence of the victim's prior instances of first aggression.

This court has recognized that "before evidence of first aggressiveness is relevant, some evidence must be introduced which would raise an issue as to who was the first aggressor." *Laterral Jolly*, 1993 WL 523590, at *3. The defense sought to introduce evidence of the victim's prior criminal history after both Mr. Lee and Defendant had testified. At that point in the trial, evidence had been introduced that the victim was jealous of Defendant and believed that Defendant was still involved with Ms. Townsend. According to Defendant, the victim was stalking him and often confronted him while Defendant was walking his daughter to school. Defendant tried to avoid him, but his

- 17 -

efforts were unsuccessful.  Although on the night of the shooting the victim threatened to kill Defendant next time the victim saw him, the defense proof also established that the victim was singing or rapping that "someone" was going to die "tonight" while looking at Defendant.  Such evidence suggests that the victim was threatening to kill Defendant the very night that the shooting occurred.  The defense presented evidence that Defendant and his group of friends attempted to avoid the victim but that the victim actively sought out Defendant, cursed him, called him names, and threatened him.  Defendant testified that after he returned with a gun, he intended to go to a friend's apartment with a group.  According to Defendant, the victim had moved away from the group, but upon Defendant's return, the victim again approached the group and resumed his verbal attack and threats to fight Defendant.  Both Mr. Lee and Defendant testified that the victim also was reaching inside his pants near his waistband as if he had a gun.  After the victim said he wanted to fight Defendant and removed his shirt, the victim made a movement that Defendant testified appeared as if the victim was reaching for a gun, and Defendant shot him as a result.  We conclude that this evidence is sufficient to fairly raise the issue of the victim as the first aggressor.

As to the second factor, the defense sought to present the victim's prior convictions for aggravated robbery, aggravated burglary, and vandalism and his prior charge of domestic assault against Ms. Townsend.  In his reply brief, Defendant asserts that the showing of a factual basis was not necessary because the victim's initial aggressor status in each offense "is inherent in the definition of each crime and facially obvious from each charge itself."  However, this court has recognized that "[t]he mere fact that one has a conviction on his record, does not necessarily prove that he was the first aggressor, or that he even committed an aggressive act.  For that matter, not all evidence of violent acts establish[es] evidence of aggression." *Lateral Jolly*, 1993 WL 523590, at *4.  "It is conceivable that one could be involved in violent acts when he was not the original aggressor." *Id.*  "Rather than considering the record of conviction alone, the trial court must determine the underlying facts of the alleged act of aggression." *Id.*; *see, e.g. Robert Aaron White v. State*, No. M2018-01861-CCA-R3-PC, 2020 WL 532993, at *9 (Tenn. Crim. App. Feb. 3, 2020) (holding that the petitioner failed to establish a factual basis underlying the victim's alleged prior acts as the initial aggressor when the petitioner only submitted the victim's criminal history and supporting affidavits of complaint); *L.B. Rittenberry, Jr.*, 2017 WL 1278677, at *6  (concluding that the petitioner failed to establish that trial counsel was ineffective in failing to present the victim's prior conviction for assault and prior arrest for harassment as corroborative evidence that the victim was the initial aggressor when the petitioner failed to present a factual basis for the prior bad acts); *Chancy Jones*, 2012 WL 1143583, at *8 (concluding that the prior orders of protection against the victim "were not relevant on the issue of the victim's first-aggressor tendencies without some evidence regarding the factual basis supporting the protective orders"); *Derek T. Payne v. State*, No. W2008-02784-CCA-R3-

PC, 2010 WL 161493, at *14 (Tenn. Crim. App. Jan. 15, 2010) (holding that the evidence failed to support the petitioner's claim that the victim had a violent reputation or committed prior violent acts when the petitioner only offered a "Record of Arrest" of the victim's prior arrest for unlawful possession of a weapon and an affidavit of complaint showing facts leading to a misdemeanor conviction for harassment).

Defendant also relies upon the affidavits of complaint of the victim's prior convictions to establish that the victim was the initial aggressor in the commission of the offenses. However, this court has rejected the reliance upon the affidavits of complaint as competent proof of the underlying facts establishing that the victim was the first aggressor in the episode that led to the victim's prior arrests or convictions. *See, e.g. Robert Aaron White*, 2020 WL 532993, at *9; *L.B. Rittenberry, Jr.*, 2017 WL 1278677, at *6; *Derek T. Payne*, 2010 WL 161493, at *14. Thus, Defendant failed to present competent evidence establishing the victim as the first aggressor with respect to the victim's prior convictions for aggravated robbery, aggravated burglary, and vandalism.

With respect to the victim's domestic assault charge, Ms. Townsend testified during a jury-out hearing regarding the victim's actions that led to the charge approximately one month prior to the shooting. Her testimony established that the victim was the initial aggressor with regard to the charge. Thus, Defendant met the second *Ruane* factor with respect to the victim's domestic assault charge.

With regard to the third factor, the trial court excluded the evidence, finding that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403. In doing so, the trial court improperly focused upon the danger of unfair prejudice to the deceased victim. The trial court concluded that the admission of the evidence would be unfairly prejudicial to the deceased victim because he was unable to defend himself against the claims. The trial court's logic would apply to preclude evidence of first aggression by a victim in any homicide case, and this court has made it clear that such evidence is admissible. Furthermore, Defendant only sought to present the fact that the victim was charged with domestic assault approximately one month prior to the shooting and did not seek to admit the underlying facts and circumstances of the charge, thus reducing the danger that Defendant's trial would turn into a trial within a trial on the victim's charges. We conclude that the probative value of the domestic assault charge was not outweighed by the danger of unfair prejudice and that the trial court, therefore, abused its discretion in excluding the evidence.

We further conclude that the error was harmless in light of other evidence presented at trial regarding the victim's aggressiveness. "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the

- 19 -

judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); *see Samuel Sherrill*, 2011 WL 1564009, at *8 (concluding that the improper exclusion of the victim's prior acts of first aggression was harmless error). The "crucial consideration" in undertaking a harmless error analysis is "what impact the error may reasonably be taken to have had on the jury's decision-making." *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008) (citations omitted). Ms. Townsend testified at trial that she felt forced into a relationship with the victim due to fear of him and that she did not want him to be alone with her children. Evidence was presented regarding the victim's jealousy of Defendant, the victim's stalking and threatening Defendant as Defendant was walking his daughter to school, and the victim's threats and harassment of Defendant on the night of the shooting. The jury chose to reject Defendant's claim of self-defense and convicted him of second degree murder. In light of the evidence presented at trial regarding the victim's aggressiveness, we cannot conclude that the trial court's error in excluding evidence that the victim had been charged with domestic abuse more probably that not affected the verdict.

## II. The Trial Court's Instruction to the Jury on the Duty to Retreat

Defendant asserts that the trial court erred in failing to instruct the jury that he had no duty to retreat. He specifically argues that the trial court erred in finding that he was acting unlawfully and that even if he was acting unlawfully, his actions did not preclude an instruction to the jury that he had no duty to retreat. He also contends that the trial court erred in instructing the jury that he had an affirmative duty to retreat. The State responds that the trial court properly instructed the jury and that any error is harmless.

"[T]he trial court has a duty to provide a 'complete charge of the law applicable to the facts of a case.'" *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). This duty includes "giving jury instructions concerning issues fundamental to the defense and essential to a fair trial." *State v. Anderson*, 985 S.W.2d 9, 17 (Tenn. Crim. App. 1998). Jury instructions must be reviewed in their entirety, and phrases may not be examined in isolation. *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008). "'An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'" *State v. Majors*, 318 S.W.3d 850, 864-65 (Tenn. 2008) (quoting *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005)). As a mixed question of law and fact, our standard of review for questions concerning the propriety of jury instructions is de novo with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

As relevant to this case, Tennessee Code Annotated section 39-11-611(b)(2) provides:

Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A)  The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
(B)  The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
(C)  The belief of danger is founded upon reasonable grounds.

Section 39-17-1322(a) provides that "[a] person shall not be charged with or convicted of a violation under this part if the person possessed, displayed or employed a handgun in justifiable self-defense or in justifiable defense of another during the commission of a crime in which that person or the other person defended was a victim."

Our supreme court examined the phrase "not engaged in unlawful activity" in *State v. Perrier*, 536 S.W.3d 388 (Tenn. 2017).  The court concluded that the phrase is a "condition of the statutory privilege not to retreat when confronted with unlawful force" and does not act as a complete bar to a claim of self-defense. *Perrier*, 536 S.W.3d at 392, 408.  Accordingly, "a person is entitled to a jury instruction that he or she did not have to retreat from an alleged attack only when the person was not engaged in unlawful activity and was in a place the person had a right to be." *Id.* at 401.  The court determined that the trial court should decide whether to instruct the jury that a defendant did not have a duty to retreat as part of the trial court's threshold determination of whether to instruct the jury on self-defense. *Id.* at 403.  Our supreme court stated that

the trial court should consider whether the State has produced clear and convincing evidence that the defendant was engaged in unlawful activity such that the "no duty to retreat" instruction would not apply.  Because the allegedly unlawful activity will oftentimes be uncharged conduct similar to evidence of prior bad acts, the procedure outlined in Tennessee Rule of Evidence 404(b) should be utilized by the parties.

*Id.*

The trial court found that Defendant was acting unlawfully in that he violated Tennessee Code Annotated section 39-17-1307(a)(1), which provides that "[a] person commits an offense who carries, with the intent to go armed, a firearm or a club."  "[I]f the person's carrying of a handgun occurred at a place open to the public where one (1)

or more persons were present," the offense is a Class A misdemeanor. T.C.A. § 39-17-1307(a)(2)(C). It is a defense if the person is authorized to possess or carry a firearm through a permit. T.C.A. § 39-17-1308(a)(2).

On appeal, Defendant does not challenge the trial court's findings that he was carrying a firearm with the intent to go armed in violation of 39-17-1307(a)(1). Rather, he challenges the trial court's findings that he did not have a valid permit to carry the firearm and, therefore, was acting unlawfully. In this regard, Defendant does not challenge the trial court's comments that Defendant failed to establish that he had a permit for his gun but argues that the trial court erred in relying upon the testimony of Ms. Justice based upon a printout from the Tennessee driver's license database that showed no gun permit issued to Defendant. Defendant maintains that the evidence was hearsay and violated his confrontation rights. However, he failed to cite to any authority in his brief to support his claim and, therefore, has waived the issue. *See* Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7). Defendant also argues that Ms. Justice's testimony did not consider the fact that he was a California resident. He was a Tennessee resident at the time of the shooting and did not move to California until after the shooting occurred. Defendant is not entitled to relief on this issue.

Defendant contends that even if he committed the offense of carrying a firearm with the intent to go armed, he was not acting unlawfully for purposes of determining whether he had no duty to retreat. Defendant bases his argument upon Tennessee Code Annotated section 39-17-1322(a), which provides that "[a] person shall not be charged with or convicted of a violation under this part if the person possessed, displayed or employed a handgun in justifiable self-defense or in justifiable defense of another during the commission of a crime in which that person or the other person defended was a victim." Defendant maintains that if a citizen, who possessed a firearm without a permit and is asserting self-defense based upon his use of the firearm is held to have been acting unlawfully, the holding would effectively repeal section 39-17-1322 and lead to an absurd result.

Our supreme court rejected a similar argument in *Perrier* by a defendant who claimed self-defense in shooting the victim when the defendant was a convicted felon in possession of a firearm in violation of Tennessee Code Annotated section 39-17-1307(c)(1). *Perrier*, 536 S.W.3d at 404. The defendant in *Perrier* argued that based upon the "Notwithstanding § 39-17-1322" language in the self-defense statute, "the legislature did not intend for possession, display, or employment of handguns to ever be the unlawful activity that would require the defendant to retreat before using defensive force." *Id.* In rejecting the defendant's argument, our supreme court noted that "the common law duty to retreat required 'that the slayer must have employed all means in his power, consistent with his own safety, to avoid danger and avert the necessity of taking

another's life'" and that, as a result, a duty to retreat does not prohibit a person from defending herself or himself. *Id.* (quoting *State v. McCray*, 512 S.W.2d 263, 265 (Tenn. 1974)). A defendant may defend himself and, based upon section 39-17-1322, may be acquitted of a weapons charge if the jury finds that the defendant acted in justifiable self-defense. *Id.* The court stated that "[t]hese provisions are not mutually exclusive." *Id.* The court in *Perrier* expressly overruled this court's opinion in *State v. Deanty Montgomery*, in which this court adopted the position advocated by Defendant in the present case. *Perrier*, 536 S.W.3d at 404 n.7 (citing *State v. Deanty Montgomery*, No. E2014-01014-CCA-R3-CD, 2015 WL 3409485, at *7 (Tenn. Crim. App. May 28, 2015)). Although Defendant argues that *Perrier* only applied to convicted felons in possession of a firearm, the analysis in *Perrier* does not include any such limiting language, and we are bound by the rulings of the Tennessee Supreme Court. Accordingly, Defendant is not entitled to relief regarding this issue.

Finally, Defendant challenges the following jury instruction by the trial court:

The law of self-defense requires that the defendant must have employed all means reasonably in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life. This requirement includes the duty to retreat, if, and to the extent, that it can be done in safety.

Defendant asserts that the common law duty to retreat has been repealed by statute and that the Tennessee Supreme Court in *Perrier* interpreted the self-defense statute as recognizing a privilege not to retreat afforded to a defendant who is acting lawfully rather than an affirmative duty to retreat of a defendant who is acting unlawfully. Defendant also notes that the challenged jury instruction is not included in the pattern jury instructions that were revised following *Perrier*. *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 40.06(b).

Although the instruction is not included in the pattern jury instruction, "the pattern instructions are not mandatory but merely suggestions, and a trial court is not required to use them in instructing a jury." *State v. Harris*, 839 S.W.2d 54, 74 (Tenn. 1992) (citing *State v. Martin*, 702 S.W.2d 560, 564 n.5 (Tenn. 1985), *overruled on other grounds by State v. Brown*, 836 S.W.2d 530, 543 (Tenn. 1992)). Furthermore, "pattern jury instructions are only suggestions for a trial court because they are 'not officially approved by [the Tennessee Supreme Court] or the General Assembly and should only be used after careful analysis.'" *State v. Rimmer*, 250 S.W.3d 12, 30 (Tenn. 2008) (quoting *State v. Hodges*, 944 S.W.2d 346, 354 (Tenn. 1997)). "[P]attern jury instructions are not entitled to any particular deference on review." *Id.*

As recognized by our supreme court in *Perrier*, when the General Assembly codified the law on self-defense in 1989, it included a provision that eliminated the duty to retreat that had been recognized in common law, including in the statute that "'[t]here is no duty to retreat before a person threatens or uses force.'" *Perrier*, 536 S.W.3d at 397 (quoting T.C.A. § 39-11-611(a) (1989)). In 2007, the General Assembly re-wrote the statute to provide that a defendant had no duty to retreat only in certain circumstances. *See* T.C.A. § 39-11-611(b); *Perrier*, 536 S.W.3d at 397-98. Thus, logic dictates that the defendant would have a duty to retreat if he or she did not fall within those enumerated circumstances. Furthermore, the court analyzed the defendant's argument in *Perrier* that the legislature did not intend for the possession, display, or employment of handguns to be the unlawful activity that would require a defendant to retreat before using defensive force by applying principles set forth under the common law duty to retreat. *Perrier*, 536 S.W.3d at 404. In recognizing that "a duty to retreat does not mean that a person cannot defend herself or himself," the court applied the principle from common law that a duty retreat required "'that the slayer must have employed all means in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life.'" *Id.* (quoting *McCray*, 512 S.W.2d at 265). We note that this is the exact language that the trial court used in its instruction. The instruction was a correct statement of the law, and, therefore, Defendant is not entitled to relief regarding this issue.

## CONCLUSION

Upon reviewing the record and the applicable law, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE

- 24 -